Argued October 22, 1930; affirmed March 31; rehearing denied
May 19, 1931

# STORLA *v.* SPOKANE, PORTLAND & SEATTLE TRANSPORTATION CO. ET AL.

(297 P. 367, 298 P. 1065)

*John L. Storla,* of St. Helens, in pro per.

*Fletcher Rockwood,* of Portland, for Spokane, Portland & Seattle Transportation Co.

*Frank Senn,* of Portland, for J. H. Flynn.

ROSSMAN, J. Contending that his charge was supported by proof, the plainitff argues that the circuit court erred when it withdrew from the consideration of the jury the specification of negligence which alleged that at the time of the accident the bus was being operated at a speed greater than thirty-five miles per hour. We have carefully read the transcript of evidence, especially the parts pointed out by the plaintiff, and believe that the following fairly indicates all portions which mention the speed of the bus. Both that vehicle and Dr. Flynn's car, a Chrysler, were proceeding in the same direction; the bus was ahead until it was passed by the Chrysler. Dr. Flynn, who was called to the witness stand by the plaintiff, testified upon both direct and cross-examination, that the bus' speed was thirty miles per hour. He added that he was certain of that fact because his speedometer registered that speed while he was following in the rear of the bus. Upon redirect examination he was asked:

"Q. And just prior to the bus hitting you, what did you estimate to be the speed of the bus?
"A. I don't know.

"Q. Was it going 40—50—60 miles per hour?
"A. Oh, no.
"Q. Was it going 40?
"A. I don't think so. It might have been, I had no time to study it. I was trying to get out of the way."

A Mrs. Hammer, who was an occupant of Dr. Flynn's automobile, estimated the speed of the bus as 30 miles per hour; but added that when the Chrysler, "was half way the length of the bus * * * the bus increased its speed * * * it just seemed to be going faster * * *." She stated that the Chrysler's speed was 35 miles per hour while it was passing the bus. Hence the latter's speed, even after being accelerated, was less than 35 miles per hour, if her estimates were accurate. Her son Robert, who was also a guest in the Chrysler car, was unable to estimate the speed of the bus or of the Chrysler. He contented himself with the statement that the speed of neither was "alarming" and that both were going at the usual or ordinary rate of speed. The driver of the bus, who was also called as a witness by the plaintiff, testified that his speedometer, which was periodically tested in order to assure accuracy, indicated that the bus was proceeding at the rate of 35 miles per hour. He denied increasing his speed when the Chrysler came alongside. A Mrs. Stabor, a passenger in the bus, who was also a witness for the plaintiff, thus described its speed: "I think it was going 35 miles per hour * * *. It wasn't going any less than that." She added: "I would hesitate to say that it was going faster." Upon cross-examination she modified the foregoing by saying: "I am not positive" of the bus' speed. Miss Ella Muir, also a passenger upon the bus, who was likewise a witness for the plaintiff, testified that in her opinion the bus' speed was "the usual rate;" "Q. And that is 35 miles an hour? A. Yes." Theodore Berg, a farmer, who was

standing in his field alongside of the highway, a half mile from the scene of the accident, testified that when the bus passed him its speed was "nothing unusual. About 35 or 40 miles an hour * * * something like that. I never saw the speedometer but I just judge it was 35 or a little better." "Q. * * * You just glanced up and saw nothing unusual? A. Yes. Q. And going about its usual speed and your best estimate was about 35 miles per hour? A. A little better maybe. Q. But you don't know? A. No." A Mr. Bernard, a passenger in the bus who was called as a witness by the transportation company, estimated its speed as "30 to 35 miles an hour."

It is evident that the only positive impressions that any witness gained of the bus' speed indicated that it was proceeding along its way at a rate of 30 or 35 miles per hour. If any finding is warranted that it was going faster the conclusion must be based upon (1) the answer of Dr. Flynn that it "might have been going 40 miles per hour * * * I don't think so," (2) the impression of Mrs. Hammer that the bus "seemed to be going faster" when the Chrysler drew up alongside than previously, and (3) Berg's testimony that the bus was going 35 miles per hour or a "little better maybe," qualified by the answer that he didn't know. The conjectures and speculations of witnesses derived by them from observed facts, and their statements eminating from a condition of mind which does not amount to an impression (because the observer had an inadequate opportunity to make observations) are not evidence. Professor Wigmore, after reviewing many authorities, states his conclusion thus:

"What the courts repudiate, then, is a mere guess, an exercise of the imagination, a suspicion, a conjecture, offered in place of the result of actual personal observation." Wigmore on Evidence (2d Ed.), § 658.

Even though the rules of evidence may have failed to exclude the conjectures, speculations, or notions of the witnesses, and such incompetent testimony thereby gained its way into the record, yet the party who produced it will not become entitled to a judgment based upon it, because the substantive law requires that findings must be substantiated by evidence which establishes the needed facts: Wigmore on Evidence (2d Ed.), § 663; *Goldfoot v. Lofgren,* 135 Or. 533 (296 P. 843). It is our opinion that the plaintiff failed to produce any testimony indicating that the bus was traveling faster than 35 miles per hour, and that hence the court committed no error when it made the criticised ruling.

■ It is next contended that the circuit court's definition of gross negligence was erroneous: 1929 Session Laws, p. 550, provides that no non-paying guest of an operator of an automobile shall have a cause of action for damages against his host for injury or death in case of accident "unless such accident shall have been intentional on the part of said owner or operator or caused by his gross negligence or intoxication, or his reckless disregard of the rights of others." After properly defining negligence the court thus defined gross negligence:

"A brief definition I think I can say is 'great negligence.' The term 'gross' you know, means great or extreme. Gross negligence must include an element of carelessness so great that the jury can say that there was not only an absence of the due care that should have been exercised, but also a degree of negligence materially greater than that which would constitute ordinary negligence. What would be gross negligence under one set of circumstances might not be so under another, and the highly dangerous consequences to be apprehended in one case might contribute to render that gross negligence which would not be such in an-

other case. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.

"Gross negligence means an absence of any care on the part of a person and it is the duty of plaintiff to prove to you by a preponderance of the evidence that the personal rights of plaintiff were recklessly disregarded by the failure of defendant to act so as to avoid such injuries, evincing an utter disregard of the consequences by which such injuries was caused.

" 'Gross negligence' contemplates a disregard of the safety of others greater than in the case of ordinary negligence, or failure to use reasonable care under the circumstances. 'Gross negligence' does not require that the injury is intentional but I believe it does require that the negligence be intentional if the person knowingly and wilfully fails to perform a duty owing to other persons and thereby causes injury. The term 'gross negligence' cannot be defined exactly but it means generally, the same as an utter reckless or deliberate disregard of the safety of others.''

Ensuing parts of the instructions declared that before Dr. Flynn could be liable "the evidence must show gross negligence on his part, as the expression has already been defined; or the evidence must show him to be guilty of reckless disregard of the rights of plaintiff and his son.'' Accompanying each paragraph of that portion of the instructions, which pointed out to the jury the principles of law applicable to the several charges of negligence, urged against Dr. Flynn, the court declared: "If you determine that it was gross negligence on his part, or reckless disregard of the rights of plaintiff and his son to * * * then I instruct you that your verdict should be against defendant Flynn and in favor of the plaintiff.''

Plaintiff's criticism of the circuit court's definition of gross negligence is summarized in his brief in the

following language: "The jury was instructed that gross negligence means (1) not only an absence of the due care that should have been exercised, but also a degree of negligence materially greater than that which would constitute ordinary negligence; (2) a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence; (3) absence of any care. (4) Utter disregard of consequences. (5) Intentional act. (6) Utter reckless or deliberate disregard of the safety of others."

In *Gill v. Selling,* 125 Or. 587 (267 P. 812, 58 A. L. R. 1556), Mr. Justice Belt quoted the following definitions of gross negligence found in 20 R. C. L. 23:

" 'Gross' negligence, however, is not characterized by inadvertence, but 'by an absence of any care on the part of a person having a duty to perform to avoid inflicting an injury to the personal or property rights of another, by recklessly or wantonly acting or failing to act to avoid such injury, evincing such an utter disregard of consequences as to suggest some degree of intent to cause such injury.' "

The Connecticut rulings are peculiarly important because the guest statute of that state very likely inspired the Oregon law. It limits the liability of the host to injuries arising out of accidents "intentional on the part of said owner or operator or caused by his heedlessness or his reckless disregard of the rights of others." In *Silver v. Silver,* 108 Conn. 371 (143 Atl. 240, 65 A. L. R. 943), the court pointed out:

"The language of the statute indicates an intention to limit such liability to two classes of cases: First, when the accident was caused by intentional misconduct; and, second, when it was caused by heedless or reckless disregard of the rights of others, meaning thereby something more than the mere failure to exercise the care of a reasonably prudent man."

And in *Grant v. MacLelland,* 109 Conn. 520 (147 Atl. 138), the same court said:

"The instruction to the jury that the second of the cases where the act gave the right of action was, 'when it was caused by heedlessness or reckless disregard of the rights of others, meaning thereby something more than ordinary negligence,' and the further instruction, 'in other words, he must have done something more than actually fail to do just what an ordinarily prudent man would have done in order for the plaintiff to recover,' was not a sufficient guide for the jury. They should have been instructed that this language should be read, 'caused by his heedless and his reckless disregard of the rights of others,' and in substance that it constituted wanton misconduct which consisted of a reckless disregard of the just rights or safety of others in their lives, limbs, health, reputation or property, or of the consequences of one's action."

In *Krause v. Rarity,* 210 Cal. 644 (293 P. 62), the California court interpreted the guest statute of that state which denied liability in favor of a guest unless the injury resulted from the "intoxication, wilful misconduct, or gross negligence of" the operator. It held:

"In many jurisdictions the division of negligence into degrees is not countenanced (20 R. C. L. 21); the concept being that such phrases as 'gross negligence' and 'slight negligence' are misnomers. In this state the degrees of negligence have been frequently recognized. The term 'gross negligence' has been defined as 'the want of slight diligence,' as 'an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others,' and as 'that want of care which would raise a presumption of the conscious indifference to consequences.' "

In *People v. Adams,* 289 Ill. 339 (124 N. E. 575), the Illinois court said:

" * * * Gross negligence is negligence that borders on recklessness, and wanton negligence, as ap-

plied to the running of motors and vehicles, implies a positive disregard of the rules of diligence and a reckless heedlessness of consequences, according to Babbitt in his work on Motor Vehicles, section 1517.''

A very large number of definitions of the term ''gross negligence'' may be readily gathered. A reading of them discloses that the courts are not agreed upon the meaning which should be assigned to this term. The word ''negligence'' possesses a definite meaning because it is based upon the conduct of a specific individual, that is, the reasonably prudent person. But no definition of the term ''gross negligence,'' which has come to our attention, assumed that the meaning of that term was based upon the conduct of some person whom the common law had selected as a standard, unless it be possibly the conduct of a careless, thoughtless, or inattentive person. Such being true it is difficult for ''gross negligence'' to achieve the definiteness of meaning that ''negligence'' possesses. Its import, in individual instances, will possibly be affected somewhat by the manifest purpose of the legislative act. Clearly the object of the present act is to relieve the host from liability for ordinary negligence. It evidently intends that the law applicable to the automobile host should make a distinction between the care owed to a gratuitous guest and a paying passenger somewhat comparable to distinctions made by other branches of the law which discriminate against those who receive services free of charge; for instance the law of bailments. Cyclopedia of Automobile Law at page 959 reviews the decisions of other courts wherein the law of gratuitous bailments has been applied in such instances. See also 4 A. L. R. 1209.

The first paragraph of the circuit court's definition, we believe, is a fair statement of the meaning of

gross negligence. It is true that this paragraph employs the terms "a degree of negligence materially greater than that which would constitute ordinary negligence" and "manifestly smaller amount of watchfulness and circumspection than the circumstances require," but we believe that it is evident that the court used the words "materially" and "manifestly" as equivalent to "substantially." As thus interpreted this paragraph fairly imparted to the jury the same conception of the meaning of gross negligence as is suggested by the Connecticut and California decisions. See also Cyclopedia of Automobile Law, 960.

The contention that the circuit court's definition of gross negligence embraced an element of intentional wrong-doing is manifestly without merit. The definition construed in its entirety readily refutes this criticism, and specifically pointed out: "Gross negligence does not require that the injury is intentional."

We come now to the criticism which is based upon the use by the circuit court of the expressions "utter disregard of the consequences," "utter reckless or deliberate disregard of the safety of others," and "an absence of any care." It will be observed that the definition of gross negligence, as quoted by Mr. Justice BELT from Ruling Case Law employs the term "an absence of any care." The definition given by Corpus Juris uses the same term: 45 C. J. 667. We quote from *Farmers' Mercantile Co. v. Northern Pac. R. Co.*, 27 N. D. 302 (146 N. W. 550): "Gross negligence is, to all intents and purposes, no care at all  *  *  *  It is the absence of even slight care." But, we believe that while gross negligence includes conduct so heedless of consequences that all care is absent, that nevertheless, the total lack of care is not a requisite quality. It

is our opinion that in the present instance gross negligence is used as the equivalent of great negligence, aggravated negligence, or carelessness substantially greater than ordinary negligence. It is true, as suggested by the plaintiff, that the word "utter" ordinarily means entire or complete. Hence, it is possible to so construe the three above expressions as to make them mean an absence of care. But in the interpretation of a charge a hypercritical construction should be avoided. The jurors ordinarily are not lexicographers, and in grasping the meaning of any term, employed in an instruction, they are guided by the entire context. Hence an appellate court, reviewing a charge, endeavors to ascertain the meaning which the trial court and the jury, in the exercise of common sense, employed: Randall's Instructions to Juries, § 530. Moreover in determining whether instructions are misleading or erroneous, their language will be construed with reference to the pleadings and the evidence. The complaint nowhere charges that Dr. Flynn operated his car without exercising any care whatever, except in one of the ten specifications of negligence which is couched in the form of a conclusion of law, and which played no material part in the trial of the cause. No incident that occurred during the trial indicated that the plaintiff must prove that Dr. Flynn totally failed to exercise care. The court never so declared, and the unquoted portions of the charge, far from supplying such an implication, are hostile to it. Dr. Flynn testified that he could not have prevented the occurrence of the accident by explaining that the bus crowded him off of the highway at the moment when he was about to pass it. All witnesses agreed that the left wheels of his car were running upon the graveled shoulders of the pavement just before the impact occurred. Other

evidence indicated that the Chrysler turned to the right before it had completely passed the bus and thereby locked its right rear fender into the left extremity of the front bumper of the bus. In order to prove negligence the plaintiff relied almost entirely upon a contention that the Chrysler was proceeding at an excessive rate of speed, although most of his witnesses testified to the contrary. We have given the above review of the facts, developed by the proof, for the purpose of showing that no one contended that Dr. Flynn was operating his car without exercising any care whatever. The above being the condition of the pleadings and of the proof an interpretation of the instructions harmonious therewith is to be preferred, provided we do not ignore any construction of the charge that a juror could fairly have made. We notice that the quoted instruction makes frequent use of the word "great" and tells the jury that "gross" and "great" may be used interchangeably. At other times it substitutes "materially" and "manifestly" for these words. It seems to us that the court used "utter" in a manner that indicated its meaning was equivalent to "great." We further believe that the court's use of the word "utter" could not have misled any juror into the belief that the portions of the instructions were withdrawn which clearly and in a very understandable manner told him that gross negligence means (1) great negligence; (2) a materially greater lack of care, and (3) a manifestly smaller amount of watchfulness. The above being our conclusions we find no reversible error arising from the fact that the instruction used the word "utter." We do not, however, commend such an instruction. We have carefully considered all other criticisms of the court's definition of the term "gross negligence" but find no error disclosed by them.

■ In the remaining assignment of error it is contended that the circuit court erred when it instructed the jury thus:

"At the request of counsel for defendant Flynn, I instruct you that there is no evidence in this case that there is any insurance involved in this case and you must not discuss any question of insurance. By discussing such subject or giving it any weight in your deliberations, you would be violating your oath and by so doing you might do a great wrong to these defendants."

Clearly this instruction should have been omitted unless some special circumstance required these precautionary remarks. We reiterate that the presence or absence of insurance is generally an immaterial circumstance in actions of this kind. The brief of counsel for the defendant, Flynn, however, states:

"In this very case, when one of the jurors was interrogated on his voir dire, he being from Rainier, it was disclosed he was an agent for various insurnace companies, and he was asked the question whether or not he was agent for any insurance company represented by F. S. Senn, attorney for Dr. Flynn in this case, and he was asked whether he had any dealings with F. S. Senn in the matter of a settlement of any insurance claims."

The reply brief of the plaintiff states: "Appellant recalls that he asked this juror if any of the insurance companies represented by him were interested in the outcome of the case." A document appearing in the files of this cause under the signature of the official court reporter, who transcribed the proceedings of the trial, purports to set forth the examination of the aforementioned juror. Since this document does not appear to be a part of the bill of exceptions, we would ignore it but for the admissions contained in appel-

lant's brief. Upon his voir dire examination by the plaintiff this juror was examined concerning his business transactions with insurance companies, with Mr. Senn, and Dr. Flynn. For instance, he was asked (referring to Mr. Senn): "Has he acted as attorney for the insurance company you represent? A. Every one, I believe. Q. He does represent some of your companies? A. I think so." Under these circumstances we cannot say that the court erred when it gave to the jury this cautionary instruction.

Finding no error in the record the judgment of the circuit court is affirmed.

BEAN, C. J., RAND and KELLY, JJ., concur.

---

Rehearing denied May 19, 1931

ON PETITION FOR REHEARING
(298 P. 1065)

ROSSMAN, J. The petition for a rehearing is accompanied by an unusually capable and thorough brief which argues again the various assignments of error brought before us by this appeal, and assembles in a very orderly manner the evidence applicable to the several issues of fact. The intelligent labor once more expended upon this cause by the plaintiff has prompted us to again bestow upon it careful attention.

█ Much of plaintiff's brief is devoted to an effort to show that the record contains evidence capable of supporting a finding that the defendant Flynn was guilty of gross negligence. We have been satisfied from the outset that such evidence is present in the record, but the material point is that the record also contains substantial evidence showing that Flynn's car was not being operated in a grossly negligent manner; in fact,

if the testimony of Flynn and his witnesses is true his car was being operated in a prudent manner. Such being the situation, the issue created by the plaintiff's charge of gross negligence was for the determination of the jury.

The brief accompanying the petition once more assails the instruction which defined gross negligence, and claims that the circuit court's definition of that term was not only ambiguous but could have led the jury to believe that gross negligence meant the absence of all care.

The purpose served by an instruction is to impart to the jury the necessary information in regard to the law so that they may be informed upon the rules of conduct applicable to the parties when the asserted claim arose. In construing the meaning of an instruction the literalities of language may be disregarded, and the instruction should be construed in the manner in which it must have been understood by the jurors, as practical men, in the light of the other portions of the charge, the evidence, the issues asserted during the course of the trial, and the circumstances of the trial. If the instruction is capable of supporting two meanings, one being the result of the ingenuity of counsel expended at leisure and the other the meaning which the jurors obviously must have placed upon it, the former will be discarded and the latter will be accepted as the proper one. It seems to us, as stated in our previous decision, that the jurors, as practical men, could not reasonably have understood the court's definition of gross negligence to mean the absence of all care. Even if such a meaning could have been drawn from the definition, other parts of the charge which stated the issues developed by the pleadings and the circum-

stances under which a verdict for either party was returnable, readily showed it was not meant. It is true that a portion of the definition employed by the court does not contain technical precision of language, but such niceties are not to be expected where the instructions are oral and follow quickly the close of the evidence and counsels' arguments. Moreover, the essential objective to be achieved is not the use of some particular words, but the conveyance of the correct understanding of the law. We believe that the instructions fairly imparted to the jury the idea that gross negligence meant not only an absence of the due care required by the circumstances but also a degree of negligence materially greater than that which constitutes ordinary negligence. Such being true, appellant's brief discloses no reversible error.

The other matters again argued in the additional brief likewise fail to disclose to us any reversible error.

We sincerely regret the death of plaintiff's son, who was a bright, promising child, but, since no error is manifest to us, it follows that the petition for a rehearing is denied.

BEAN, C. J., RAND and KELLY, JJ., concur.